**SIMMONS COMPANY, Plaintiff,**

v.

**Abraham (Abe) BAKER, as an individual
and also d/b/a Simmonds Upholster-
ing Company.**

**Simmonds Upholstering Co., Inc.
Simmonds Sales System, Inc.**

**and**

**New England Upholstering Co., Inc.,
Defendants.**

**Civ. A. No. 58–1014–S.**

United States District Court
D. Massachusetts.

Nov. 15, 1961.

Donald R. Anderson, Hill, Barlow,
Goodale & Adams, Boston, Mass., C. A.
Soans, Wm. E. Anderson, Francis A.
Even, Soans, Anderson, Luedeka &
Fitch, Chicago, Ill., for plaintiff.

C. Keefe Hurley, Boston, Mass., for
defendants.

McCARTHY, District Judge (retired,
by designation).

### Findings of Fact

#### A. *The Suit*

1. This is an action for infringement
of federally protected trademarks, for
infringement of trademarks protected by
the common law, and for unfair com-
petition. The important defenses relied
upon were laches and the doctrine of un-
clean hands, the unclean hands allegedly
arising from violations of the provisions
of the Lanham Act by the plaintiff cor-
poration in that the plaintiff corporation
allegedly used its registered trademarks
in attempted monopolization in violation
of the anti-trust laws and in that the
plaintiff corporation attempted to monop-
olize the motel mattress trade in viola-
tion of the anti-trust laws, and further,
that the plaintiff corporation's SCAP
program constituted a violation of the
provisions of the Robinson-Patman Act,
15 U.S.C.A. § 13 et seq.

After an extensive trial, which covered
fifty days in all, at which parties liti-
gant were represented by most competent

and courteous counsel, briefs were prepared and the merits argued.

### B. The Parties and Their Origins

2. Plaintiff originally was founded as a manufacturing concern in Wisconsin before 1884 by G. Simmons under the name "Northwestern Wire Mattress Company" and commenced the manufacture of woven wire mattresses. In 1884 the "Northwestern Wire Mattress Company" a corporation of Wisconsin, was formed to succeed to the business of Z. G. Simmons. In 1899 the Wisconsin corporation, "The Simmons Manufacturing Company", succeeded to the business. In 1915 the plaintiff "Simmons Company" was organized as a Delaware corporation to succeed to the business and assets of "The Simmons Manufacturing Company".

3. The management of Plaintiff and its predecessor companies has always been in the family of the founder Z. G. Simmons, each president has had the surname "Simmons". The president of the company is a great grandson of the founder.

4. Since 1899, when the name of the business became "The Simmons Manufacturing Company", Plaintiff and its predecessor have used the name "Simmons" as a trademark on substantially all of the goods which Plaintiff has manufactured, also as a trade name, to identify goods sold by Plaintiff.

5. Defendant Abraham Baker is a Massachusetts citizen. He does business as "Simmonds Upholstering Company". He is owner of the corporate Defendants Simmonds Upholstering Company, Inc., and New England Upholstering Company, Inc., and always owned the controlling shares of the defendant Simmonds Sales System, Inc. All corporate Defendants were organized under the laws of the Commonwealth of Massachusetts.

6. Defendant Simmonds Upholstering Co., Inc., was organized in 1950, and about 1952 it became the sales branch of the furniture business conducted by the Defendant Abe Baker. It sells upholstered furniture and re-upholstering service to the public in the New England States, New York and formerly in Pennsylvania. Defendant Simmonds Upholstering Co., Inc., also purchases and owns the upholstery fabrics used in the manufacturing process by Defendant New England Upholstering Company.

7. Defendant New England Upholstering Company was organized in 1946. It was and is the manufacturing arm of Abraham Baker, doing business as Simmonds Upholstering Company, and since 1952 has performed the same function for Defendant Simmonds Upholstering Co., Inc.

8. Abraham Baker, doing business as Simmonds Upholstering Company, concerns itself chiefly with the salvaging of furniture taken from customers of Simmonds Manufacturing Co., Inc., and the salvaging of waste materials from the manufacturing operation.

9. Defendant Simmonds Sales System is now dissolved but it was still a corporation for purposes of suit against it at the time this action was brought. It was organized in 1950 by Abraham Baker to expand the business through a system of franchises which were granted to established upholsterers and re-upholsterers in New York, New Jersey, Pennsylvania, and Michigan and which gave the franchise holders the right of defendants to use the name "Simmonds", together with methods, know-how and other services of defendants.

### C. General Description of The Business Activities of Parties To This Action

10. Plaintiff manufactures furniture including bedding products, living room furniture convertible into beds, various types of upholstered furniture for institutions which include private schools and colleges, hotels, and motels, and upholstered living room furniture of a nonconvertible nature since 1958, all of which are sold under the name "Simmons" throughout the United States.

11. Furniture manufactured by Plaintiff includes bed springs, bed steads,

mattresses, cabinet beds, and in-a-door beds; various kinds of upholstered furniture convertible to beds, such as day beds, lounges, sofa beds, and the like; hospital beds and other institutional furniture including chairs, cabinets, dressers, chests, wardrobes, etc.; upholstered furniture of various types for general use; and wood and metal furniture of many kinds.

12. Plaintiff has thirteen manufacturing plants located throughout the United States from East to West, including one at Medford, Massachusetts, and three in other Eastern coastal states. It has sixty-six distribution warehouses. Plaintiff does, and has done for many years, a substantial volume of wholesale business in furniture and bedding nationally and in the New England area.

12(a). Plaintiff's annual volume of business nationally and in the New England area was as follows:

|  | National | New England |
|---|---|---|
| 1927 | 29,817,009.00 | 853,558.00 |
| 1930 | 28,124,946.00 | 1,153,527.00 |
| 1935 | 20,884,165.00 | 685,892.00 |
| 1940 | 30,591,711.00 | 1,242,177.00 |
| 1945 | 37,739,703.00 | 749,447.00 |
| 1950 | 109,879,358.00 | 4,470,312.00 |
| 1955 | 123,721,318.00 | 4,284,311.00 |
| 1959 | 115,257,236.00 | 3,609,240.00 |

13. Plaintiff has spent great sums in advertising its products and in establishing the name SIMMONS in the mind of the public. In the last twenty years, it has spent an average of two million dollars per year for advertising. Most of this expenditure was for advertising in magazines of national circulation, and in all such advertisements, the Plaintiff's name "Simmons" was prominently displayed.

14. Plaintiff's name and reputations are well known to householders throughout the United States. Its right to the name "Simmons" has been vindicated in controversies against persons or concerns who have used the name "Simmons" or simulations thereof on related merchandise and who either discontinued or were enjoined from such use.

15. Abraham Baker began a retail furniture business in Lawrence, Massachusetts, in 1935 under the name "Baker Furniture Company" which he continued until 1945. Baker began the upholstering business under the name "Simmonds Upholstering Company" in about 1943, on the premises of Baker Furniture Company. When he began the Simmonds Upholstering Company, in 1943, it is the considered judgment of the Court that the Defendant Baker knew and had known the Plaintiff's activities in this field and its reputation.

16. Plaintiff and Defendants are in competition in the sale of furniture. Plaintiff sells new upholstered furniture to retailers who sell it to the public. Defendants reupholster old furniture and also manufacture new upholstered furniture which they sell to the public by inducing customers to order their furniture restyled. Some of this "restyled" furniture is also sold direct as new furniture. More than sixty per cent of Defendants' manufacture is of such allegedly "restyled" furniture, which is essentially new furniture with the exception that Defendants employ cotton filling salvaged from old furniture, but not necessarily the customer's own. Furniture ordered restyled is delivered quicker than furniture ordered only reupholstered.

17. Defendants advertise extensively under the name "Simmonds Upholstering Company" via newspapers, radio, and television throughout New England, and parts of New York and Pennsylvania. The gross sales of the Defendant Corporation were as follows: (in millions of dollars) '59:2.4; '58:2.0; '57:2.45; '56:2.6; '55:1.7; '54:1.8; '53:1.65; '52:1.0; '51:1.2; '50:.9; '49:.6; '48:.4; '47:.4; 46:.25; 45:.2; '44:.1. These figures are graphically shown by Defendants' exhibit in support of Motion for Summary Judgment.

### D. Jurisdictional Findings

18. The amount in controversy exceeded the amount of $10,000.00 exclusive of interest and costs.

19. The Defendants used the name "Simmonds" in interstate commerce.

20. Plaintiff corporation registered its mark "Simmons" in the United States Patent Office on three different occasions. All of the registrations are unrevoked and uncancelled.

### E. Confusion

21. I find on all the evidence that the name "Simmonds" as it has been used in the conduct of the DEFENDANT'S business is indistinguishable when spoken from "Simmons", has been of a most confusing character, and that its use by the Defendants has not only in the past, but is likely in the future to cause confusion among the purchasing public in New England and elsewhere.

22. The Court finds that the name "Simmonds" has caused actual confusion in the minds of the general public. The Plaintiff corporation has received numerous inquiries and complaints about the character of the work done by the Defendant company which were intended for the Defendants. The Better Business Bureau of Metropolitan Boston received complaints from Defendants' customers who were under the impression that they had been dealing with Plaintiff. Defendants' salesmen received inquiries from customers in Massachusetts, in Rhode Island, in New Hampshire, in Connecticut and in New York as to whether they were connected with Plaintiff and some of those salesmen told customers that they represented the plaintiff. This is further evidenced by misdelivery to the Plaintiff by the United States Post Office of mail addressed to "Simmonds, Boston".

23. It is inescapably clear from an examination of the evidence that the Defendant knew that their use of the name "Simmonds" not only was likely to cause confusion in the public mind to the harm of the Plaintiff, but they also knew that customers were confusing them with the Plaintiff. The Court finds that the Defendant company knew that some of their salesmen were representing themselves as employees of Plaintiff or of a subsidiary of Plaintiff, or were failing directly or indirectly to inform a confused customer of the difference.

### F. Defendants' Right to Use Name "Simmonds".

24. Defendant's allegedly asserted right to use the name "Simmonds" is predicated upon an alleged bill of sale dated December 4, 1940, which in plain words conveyed to Abe Baker the "Simmonds Upholstering Company", established in 1899 and located on the date of the bill of sale at 471 Main Street, Bradford, Massachusetts. The Defendant Baker asserted his right in this suit and in an earlier suit brought by the Simmonds Upholstering Company in the Superior Court of Rhode Island to enjoin another from using the Plaintiff's name "Simmons". It is clear that on all the evidence this document from "William B. Simmonds" is not authentic and therefore spurious, and was manufactured deliberately by Abe Baker in an attempt falsely to establish the right to the name of "Simmonds".

25. In December of 1940 the premises at 471 South Main Street, Bradford, consisted of a two-family dwelling and a garage. This has been clearly established by the testimony of previous owners.

26. The poll tax lists of Bradford, 1898 to 1942, have never shown a William B. Simmonds at 471 South Main Street, Bradford, and no "William B. Simmonds" ever registered to vote in Bradford, and the city directories of Bradford from 1898 to 1942 do not show either a William E. Simmonds nor a "Simmonds Upholstering Company". The Bradford-Haverhill telephone directories from 1926 to 1942 do not list a "William B. Simmonds" nor a "Simmonds Upholstering Company".

27. Lucian Jutras, who was hired by Simmonds Upholstering Company in 1950, testified that a short time after he was hired he saw five or six copies of bare printed letterheads, identical with that on which the purported Bill

of Sale was written, in the hands of Baker's printer. Several months later, Jutras saw the "Bill of Sale", written out, on the desk of Baker's secretary and overheard Baker say, "It isn't aged enough". At a subsequent time, Jutras saw the original document lying on the window sill in Baker's office and was told by Baker that he was aging it. I find on all the evidence that the testimony of Lucian Jutras was true.

28. I find that the Defendant Baker stated to the Better Business Bureau of Metropolitan Boston in 1949 that he purchased the "Simmonds Upholstering Company" from one "John P. Simmonds of Andover, Massachusetts", in 1938. This is also asserted in the handbooks used by the Simmonds Upholstering Co., Inc., to train its salesmen.

29. Abraham Baker, in a Consent Judgment entered in an action brought by the Federal Trade Commission, submitted that his claim that "Simmonds Upholstering Company" was founded in 1899 was false.

### G. Harm to Plaintiff's Name

30. The confusion between Defendants and Plaintiff, and the Defendants' fraudulent treatment of their customers tend to injure the good name of Plaintiff.

31. Defendants used "bait" advertising to mislead customers into believing that Defendants will reupholster and "restyle" their furniture at a low cost. Defendants, in fact, whenever possible, declined to sell at the advertised price and attempted to induce customers to buy a much more expensive "reupholstering" job. In instances where the sales were made at the advertised price, the defendants acting through agents, by various expedients, declined to honor the sale. In more than 60% of their sales, no portion of the article of furniture which the customers sent out to be reupholstered or "restyled" was returned to them, but in their place were returned completely different articles, and the customer's own furniture, without his knowledge, was stripped for salvage of

its padding, or, if it was in good enough condition, was sold by the Defendants. The majority of the unit sales of the Defendant were in the $200 to $300 price range, to which many of the customers were manipulated by overstating the yardage requirements for reupholstering and the cost of the materials to be used, with the Defendants further profiting from the salvage or re-sale of the customer's own furniture.

32. Over 600 complaints have been received by the Boston Better Business Bureau and, in the case of confused customers, many complaints also were received by Plaintiff which indicated dissatisfaction with Defendants' work and methods of doing business.

### H. Laches

33. Plaintiff corporation became aware of the existence and activities of the "Simmonds Upholstering Company" for the first time in the summer of 1951 because of advertising which appeared in the New York City newspapers. The Simmonds Upholstering Company was promptly notified that it was infringing Plaintiff's registered trademark. Defendants, through their New York attorneys replied to Plaintiff in November of 1951, and declared there was no confusion, but declined to answer the Plaintiff a subsequent inquiry as to whether or not there was any person in the Defendants' organization whose name was "Simmonds".

34. Soon after the first awareness of the "Simmonds Upholstering Company" in New York, the Plaintiff learned that the Federal Trade Commission, the Department of Internal Revenue, and other governmental agencies were taking action against the Defendants. During the pendency of the Federal Trade Commission's action the Defendants' franchise system suddenly collapsed and the "Simmonds Upholstering Company" disappeared from all the more westerly cities in which it had appeared.

35. It is inescapably clear that the Plaintiff corporation was misled by the Defendants' false claim that "Simmonds

Upholstering Company" was established in 1899, and Plaintiff had no means of establishing the falsity of Defendants' claim until after October 1957, when Mr. Baker testified in his successful suit in the Superior Court of Rhode Island of an alleged transaction between him and one "William B. Simmonds", at which time an alleged "Bill of Sale" was produced, but I am not convinced either that the Defendant has sustained his burden of proving by a preponderance of the evidence that the circumstances surrounding the advertising and the notice already described in paragraph 33 is sufficient, in the light of all the other facts and circumstances, to show laches on the part of the plaintiff.

36. In 1956, Defendants "Simmonds Upholstering Co., Inc." applied for registration of the name "Simmonds" in the United States Patent Office upon Defendant Baker's oath that the name had been continuously in use by the Applicant and its predecessors since 1899. After the name "Simmonds" was published by the Patent Office for opposition, Plaintiff filed opposition in September 1957, and raised the issue of fraud. After Plaintiff subpoenaed Abe Baker in that action, Simmonds Upholstering Co., Inc. confessed judgment in favor of Plaintiff and abandoned the application. This Consent to Judgment was filed in the Patent Office on April 28, 1958.

37. The suit by the Plaintiff company then followed on October 10, 1958.

38. Plaintiff did not acquiesce in the Defendants' use of the name "Simmonds" and brought this action within a reasonable time after the re-emergence of "Simmonds Upholstering Company", and the means of establishing the falsity of Defendants' claim to the name "Simmonds" became available.

39. I find as a fact that defendants have not maintained their burden of proof on the issue of laches.

### I. SCAP

40. Simmons Cooperative Advertising Plan (SCAP) reimburses Plaintiff's dealers for money which they spend in advertising of Simmons' mattresses other than the Beautyrest mattress. The dealer accrues a credit of $.75 per such mattress purchased from Plaintiff and this credit is applied to the dealers' cost of advertising such mattresses in newspapers. Plaintiff reimburses the dealers to the extent of one-half the cost of such newspaper advertising.

41. To be eligible for the SCAP plan, the dealer must maintain a specifically enumerated floor display of Plaintiff's products having a total wholesale value approximating somewhat less than $1,000.00. In addition, the dealer is required to covenant that he will not pay, or permit any manufacturer competing with Plaintiff to pay to his floor salesman for his sale of any mattress competitive with plaintiff's mattresses, price class for price class, a P.M. ("push money") or "spiff" greater than that paid to the dealer by Simmons.

42. In order to obtain the dealers' commitment, Plaintiff, after notifying the dealers to see their Simmons representative if they wished to become parties to this arrangement, sent each District Manager to sign up a SCAP contract with each of the dealers who indicated a desire to participate. Plaintiff sent written notice of SCAP to its dealers.

### Conclusions of Law

1. The Court has jurisdiction of the parties and of the subject matter.

2. Plaintiff has the exclusive right to use the word "Simmons", including any simulation thereof, as a trademark or tradename in connection with the manufacture, sale, or repair of furniture and bedding.

3. United States trademark registrations Nos. 137,699; 522,319; and 548,280 are valid; Plaintiff is the exclusive owner thereof and of all rights pertaining thereto; Plaintiff's right to use the registered mark has become incontestable under 15 U.S.C.A. § 1065; and the certificates of said registrations are conclusive evidence of Plaintiff's exclusive right to use the name "Simmons" in

commerce or in connection with the goods specified in said certificates, under 15 U.S.C.A. § 1115(b).

■ 4. Defendants' use of the name "Simmonds" in the conduct of their business was intended and calculated to cause, was likely to cause, and has caused confusion with the Plaintiff among ordinary purchasers, and constituted unfair and unlawful competition, and therefore has infringed upon Plaintiff's rights in its name and trademark "Simmons" under said Federal trademark registrations and under the common law.

5. Defendants' fraudulently prepared Bill of Sale, which purported to give them a right to use the name "Simmonds", was intended to be used, and was actually used by them as a means not only to deceive this Court, but also had been used successfully to deceive another Court to believe that the Defendants had in fact succeeded to a pre-existing "Simmonds Upholstering Company" and had lawful claim to the name. I make this finding with complete exoneration of the distinguished counsel who came into this case long after this suit was brought.

■ 6. Plaintiff was misled by the deception of Defendants in representing that they were established in 1899. Its failure to bring this action promptly after learning of Defendants' use of the name "Simmonds" was excusable and does not constitute laches or estoppel in view of the fraud and deception practised by the Defendants.

7. The Defendants have operated their business in a manner which is contrary to the interests of the public and in a manner which injures the good name of the Plaintiff, thereby causing damage to the Plaintiff.

8. The evidence in this case has not satisfied the Court that the Beautyrest Sign Program or Simmons Cooperative Advertising Plan is a violation of the Anti-Trust Laws.

9. The defense of unclean hands was not proved.

■ 10. Plaintiff is entitled to a permanent injunction enjoining the Defendants, and each of them, from using the name "Simmonds", and from using any other name or representation which would lead the public to believe that Defendants are associated with the Plaintiff.

11. Plaintiff is also entitled to damages to be determined at further hearing, and to its attorneys' fees, disbursements, and costs in this action.